JEFF WINCHESTER (Nevada Bar No. 10279)
E: JWinchester@ohaganmeyer.com
**O'HAGAN MEYER PLLC**
300 S. 4th Street, Ste 1250
Las Vegas, NV 89101
T: 725.286.2801

*Attorneys for Defendants*

UNITED STATES DISCTICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| JEREMY BLAIR, an individual;<br><br>Plaintiff,<br><br>vs.<br><br>COMPLETE ASSOCIATION MANGEMENT COMPANY, LLC a Nevada limited liability company, MANAGED BUSINESS SERVICES, INC., a Nevada Corporation,<br><br>Defendants. | Case No.: 2:25-cv-00432-RFB-EJY<br><br>**MOTION TO DISMISS DEFENDANT MANAGED BUSINESS SERVICES, INC.PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6).** |

Pursuant to Federal Rule 12(b)(6), the undersigned counsel of record for Defendant Managed Business Services, Inc., d/b/a ManagedPay ("ManagedPay") files this Motion to Dismiss Plaintiff's Complaint (ECF No. 1) as to ManagedPay. As demonstrated below, all of the causes of action brought by Plaintiff hinge upon Plaintiff's claim that both ManagedPay and Complete Association Management Company, LLC were Plaintiff's employers. As demonstrated below, as a matter of law, ManagedPay, was never Plaintiff's employer.

## I. INTRODUCTION

On March 10, 2025, Plaintiff Jeremy Blair ("Plaintiff") filed his "complaint for Damages (ECF No. 1). He names two defendants: Complete Association Management Company, LLC (CAMCO) and ManagedPay. In the Complaint, Plaintiff alleges nine causes of action:

- Tortious Discharge;
- Discrimination (NRS 613.330);
- Discrimination (42 U.S.C. § 12112 et seq.);
- Retaliation (NRS 613.340);
- Retaliation (42 U.S.C. § 12203 et seq.;
- Failure to Provide Reasonable Accommodation;
- Failure to Engage in an Interactive Process;
- FMLA Interference; and
- Retaliation in violation of the FMLA.

On the face of the Complaint, each of these causes of action is based upon the existence of an employer-employee relationship between Plaintiff and his (former) employer. *See* Complaint at ¶ ¶ 21, 28, 37, 46, 56, 67, 78, 88, 98, respectively. There is no dispute that CAMCO was Plaintiff's employer. But ManagedPay, a PEO, was never Plaintiff's employer, as a matter of law, and the Complaint does not allege facts that, if true, would establish an employer-employee relationship between Plaintiff and ManagedPay. Accordingly, as demonstrated below, pursuant to Federal Rule of Civil Procedure 12(b)(6), ManagedPay should be dismissed from this matter entirely.

## II. Legal Standard

### A. Dismissal under Rule 12(b)(6)

Rule 12(b)(6) permits a defendant to move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). To withstand a motion to dismiss brought under Rule 12(b)(6), a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). While "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," a plaintiff must provide "more than labels and conclusions" and "a formulaic recitation of the elements of a cause of action" such that the factual allegations "raise a right to relief above the speculative level." Id. at 555 (citations and internal quotation marks omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678(2009) (reiterating that "recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice"). "A Rule 12(b)(6) dismissal 'can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.'" *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)).

### B. The Joint Employer Analysis

It is well established that two entities may be held jointly liable under the various anti-discrimination laws. *See Haro v. KRM, Inc.,* 2022 U.S. Dist. Lexis 59636 at *8-*9 (D. Nev. March 30, 2022). "Two entities may be joint employers where they 'simultaneously share control over the terms and conditions of employment, such that both should be liable for discrimination relating to those terms and conditions. Because the ADA's definition of employer is the same as Title VII's, there can be joint employers under the ADA as well." *Id*. (quoting *United States EEOC v. Global Horizons, Inc.*, 915 F.3d 631, 637 (9th Cir. 2019).and citing *Walsh v. Nev. Dep't of Hum. Res.*, 471 F.3d 1033, 1038 (9th Cir. 2006).

As the 9th Circuit held in *U.S. Equal Emp. Opportunity Comm'n*, 915 F.3d at 638, the critical indicator in the joint employer analysis is "the extent of control that one may exercise over the *details of the work* of the other." (Emphasis added.) Other considerations include:

> the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Id.*

Under this well-established law, the Complaint should be dismissed as to ManagedPay pursuant to Rule 12(b)(6).

**III. Argument**

**A. Managed Pay is a Professional Employer Organization ("PEO") is not a Joint Employer with CAMCO or any of its Other Clients**

It is important to understand the role a PEO plays *vis a vis* its clients. In a nutshell, PEOs are hired by businesses to provide services to employers such as payroll, onboarding, benefits, and other related services. But they do not run the day-today operations of their clients. They do not make decisions regarding hiring, firing, and employee discipline. In other words, a PEO will process the onboarding of new hies, but the PEO will not make the decision as to which candidate(s) to hire, does not have the right to direct or assign work to its client's employees, has zero control over when or how long its client's employees work, etc. *U.S. Equal Emp. Opportunity Comm'n*, 915 F.3d at 638.

It is essential to understand that PEOs do not have the expertise or the desire or even the permission to run any of their clients' businesses. Similarly, PEOs do not tell employees working at any of its clients' worksites how to perform their duties, make job assignments, or

tell any company who to hire or fire:

> [T]he PEO and the client-employer agree that the PEO will become the statutory employer for certain purposes and, in exchange for a service fee, will become responsible for processing payroll, paying payroll taxes, and providing a range of employee benefits. **The client or "worksite" employer retains control over staffing decisions and the day-to-day management of the business.** Under this PEO-developed co-employment arrangement, PEOs bring together multiple—in some cases thousands—of unrelated employers and serve as the "large" statutory employer for all of their employees. As of 2020, industry estimates suggest that some 487 PEOs provided services to 173,000 small and mid-range businesses employing approximately four million individuals in the United States.

Natalya Shnitser, *"Professional" Employers and the Transformation of Workplace Benefits,* Yale Journal on Regulation (December 30, 2021) (https://www.yalejreg.com/bulletin/professional-employers-and-the-transformation-of-workplace-benefits/) (visited on June 16, 2025) (emphasis added). Absent proof (or for purposes of this Motion, allegations) that the PEO at bar was the rare exception to the rule, greatly expanded its scope of services, and actually was involved in running CAMCO's business on a day-to-day basis, the PEO cannot be deemed a statutory "employer" for purposes of the EEO and related laws invoked in the Complaint.[1]

**B. Agencies and Courts Regularly Dismiss PEOs from Charges for Lack of Jurisdiction and from Lawsuits Under Rule 12(b)(6).**

This is not ManagedPay's first rodeo. Back in 2009, an employee of another ManagedPay client filed a Charge of Discrimination with the Nevada Equal Rights Commission ("NERC") against ManagedPay. (Winchester Dec. Exhibit 2.) In his letter closing the Charge against ManagedPay, Compliance Investigator Michael Baltz noted that the NERC "reviewed

[1] Just by way of example, in the highly regulated area of the practice of law, numerous bar associations allow lawyers to be in a PEO relationship despite the prohibition on lawyers being employed by non-lawyers. *See* Exhibit 1 to the Declaration of Jeffrey Winchester ("Winchester Dec."), attached hereto at Exhibit A.

the . . . complaint and has ruled that this case be closed because the Commission lacks jurisdiction due to no employee/employer relationship." *Id*.

In all events, the issue of whether a PEO was in a joint employer relationship with an actual employer under various state and federal laws has been extensively scrutinized in the United States over the past few decades. For example, under the FMLA's regulations, "a Professional Employer Organization (PEO) [that] contracts with client employers to perform administrative functions such as payroll, benefits, regulatory paperwork, and updating employment policies" is not a joint employer "when it merely performs such administrative functions." 29 C.F.R. § 825.106(b)(2). But if a PEO "has the right to hire, fire, assign, or direct and control the client's employees, or benefits from the work that the employees perform" the PEO may be a joint employer. *Id*. In other words, in order to pass muster under Rule 12(b)(6), the Complaint should contain allegations such as those identified in the FMLA regulations and *U.S. Equal Emp. Opportunity Comm'n*, 915 F.3d at 638. In the absence of any such allegations, ManagedPay must be dismissed from this matter. .

In *Acker v. GM LLC*, 2015 U.S. Dist. Lexis 164066 at *1-*2 (N.D. Texas, 2015), third-party FMLA administrator Sedgwick Claims Management Services, Inc. was hauled into court by the Plaintiff, along with the plaintiff's actual employer, where Plaintiff claimed that his FMLA rights had been violated. Specifically, the plaintiff claimed that :

> Defendants, Sedgwick and General Motors LLC ("GM"), interfered with his rights under the Family Medical Leave Act ("FMLA"). Plaintiff suffers from acute iron-deficiency anemia and due to that condition, he is at times unable to perform his job at GM. As a part of GM's policy to take FMLA leave, plaintiff is required to notify Sedgwick that he is taking FMLA leave. Sedgwick then makes a recommendation to GM regarding the FMLA leave, and GM may adopt Sedgwick's finding. Plaintiff has been disciplined for taking unapproved FMLA leave. He notified Sedgwick that he was taking FMLA leave, but Sedgwick claims that it was not informed of such leave. Sedgwick illegally denied plaintiff's requests for FMLA leave, and GM adopted Sedgwick's illegal denial.

Sedgwick filed a 12(b)(6) motion to dismiss for failure to state a legally cognizable claim against it. Noting that the definition of "employer" under the FMLA and the FLSA are identical, the Court observed that:

> The FMLA provides a cause of action to an employee against an employer for interfering with any right provided by the FMLA. 29 U.S.C. §§ 2615 & 2617(a)(2). An employer is defined as "any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year" and includes "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." 29 U.S.C. § 2611(4)(A). The definition of employer under the FMLA and the Fair Labor Standards Act ("FLSA") is substantially identical and decisions interpreting the FLSA provide guidance for interpreting the definition of employer under the FMLA. See Modica v. Taylor, 465 F.3d 174, 186 (5th Cir. 2006).
>
> Under the FLSA definition, an employer has "managerial responsibilities" and "substantial control of the terms and conditions of the work of [the] employees." Falk v. Brennan, 414 U.S. 190, 195, 94 S. Ct. 427, 38 L. Ed. 2d 406 (1973). The ultimate question for determining employer status is "whether an alleged employer had 'supervisory authority over the complaining employee.'" Shores v. United Cont'l Holdings, Inc., No. H-13-2745, 2014 U.S. Dist. LEXIS 179870, 2015 WL 136619 at * 3 (S.D. Tex. Jan. 7, 2015)(quoting Rudy v. Consol. Rest. Cos., Inc., No. 3:08-C-0904-L(BF), 2010 U.S. Dist. LEXIS 92764, 2010 WL 3565418 at * 6 (N.D. Tex. Aug. 18, 2010)).
>
> . . . .
>
> The FMLA anticipates a situation wherein an employer contracts with another entity "to perform administrative functions such as payroll, benefits, regulatory paperwork, and updating employment policies." 29 C.F.R. § 825.106(b)(2). The entity that performs such administrative functions is referred to as a Professional Employer Organization or PEO. 29 C.F.R. § 825.106(b)(2). A PEO is not a joint employer when "it merely performs . . . administrative functions." 29 C.F.R. § 825.106(b)(2). Factors that may lead to a determination that a PEO is a joint employer include: "the right to hire, fire, assign, or direct and control the client's employees . . . ."29 C.F.R. § 825.106(b)(2).

*Id*. at *4-*8.

Accordingly, the Court dismissed the case as to Sedgwick. *See also, e.g., Hood v. Gulf Capital Bank, Inc.*, 2022 U.S. Dist. Lexis 149900 at *10-11 (S.D. Tex. August 22, 2022) (dismissing Title VII, ADA, and state-law employment-based claims against PEO defendant under Rule 12(b)(6)).

**C. The Complaint Contains Only Conclusory Allegations that ManagedPay was Plaintiff's "Employer."**

As explained above, in order to state a cognizable claim in his Complaint that ManagedPay was his employer, Plaintiff would have had to include allegations that would, if proven true, overcome the overwhelming presumption that PEOs are not employers of their clients' employees. As noted above, Plaintiff simply makes conclusory allegations that ManagedPay was, along with CAMCO, his "employer." That's it. The Complaint comes nowhere near meeting the standards of pleading set forth by the Supreme Court in *Twombly* and *Iqbal*.

As one U.S. District Court held, "Plaintiff never alleged [in the Complaint] that FMLA Source [the defendant PEO] had the ability to control her conduct or to fire her. . . . . In fact, the complaint failed to even allege that [defendant PEO] was either a joint employer or [the employer's] agent. . . . . Thus, [the PEO] cannot face liability under the Family Medical Leave Act or the ADA because it was not an employer, a joint employer, or [the employer's] agent. *Milligan v. Greektown Casino, L.L.C.*, 2022 U.S. Dist. LEXIS 50516, *5 (E.D. Mich. March 21, 2022) (dismissing Title VII, ADA, FMLA and state-law employment claims against PEO pursuant to Rule 12(b)(6)).

Accordingly, under *Twombly* and *Iqbal,* Plaintiff's Complaint fails to state any cognizable claims pursuant to which relief could be granted against ManagedPay under a joint employer theory, and therefore ManagedPay should be dismissed from this matter pursuant to federal Rule of Civil Procedure 12(b)(6).

**IV. CONCLUSION**

As set forth above, Plaintiff's Complaint is devoid of allegations that, if proven true, would establish that ManagedPay was his employer for the purposes of any of his causes of action. ManagedPay should be dismissed from this lawsuit pursuant to Federal Rule of Civil Procedure 12(b)(6).

Dated this 16th day of June, 2025.

O'HAGAN MEYER

By */s/ Jeffrey Winchester*

JEFFREY D. WINCHESTER
Nevada Bar No. 10279
300 S. 4th Street, Suite 1250
Las Vegas, NV 89101

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

Pursuant to FRCP 5(b), I certify that I am an employee of O'HAGAN MEYER PLLC, and that on this 16th day of June, 2025, I electronically served the foregoing **MOTION TO DISMISS DEFENDANT MANAGED BUSINESS SERVICES, INC.PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6).** with the Clerk of the Court via Electronic Mail and via regular U.S. Mail, postage prepaid, as follows:

Jemma E. Dunn, Esq.
Matthew E. Hale, Esq
Michael A. Burnette, Esq
**GREENBERG GROSS LLP, LTD.**
1980 Festival Plaza Drive, Suite 730
Las Vegas, NV 89135
E: Jdunn@GGTriallaw.com
MHale@GGTriallaw.com
MBurnette@GGTriallaw.com

*Attorney for Plaintiff*

FISHER & PHILLIPS LLP
SCOTT M. MAHONEY, ESQ.
Nevada Bar No. 1099
300 S. Fourth Street
Suite 1500
Las Vegas, NV 89101
Telephone: (702) 252-3131
E-Mail Address: smahoney@fisherphillips.com

*Attorney for Defendant*
*Complete Association Management Company, LLC*

By: *|s| Krystal Williams*
An Employee of
O'HAGAN MEYER PLLC

UNITED STATES DISCTICT COURT

DISTRICT OF NEVADA

JEREMY BLAIR, an individual
Plaintiff,

vs.

COMPLETE ASSOCIATION MANGEMENT COMPANY, LLC a Nevada limited liability company, MANAGED BUSINESS SERVICES, INC., a Nevada Corporation,

Defendants.

Case No.: 2:25-cv-00432-RFB-EJY

DECLARATION OF JEFFREY WINCHESTER IN SUPPORT OF DEFENDANT MANAGED BUSINESS SERVICES, INC.'S 12(b)(6) MOTION TO DISMISS DEFENDANT MANAGED BUSINESS SERVICES, INC.

1. My name is Jeffrey Winchester. I am one of the attorneys representing the Defendant Managed Business Services in the above-captioned matter.
2. I am over the age of 18 and am competent to testify as to the following matters.
3. Attached at Exhibit 1 are true and accurate copies of the ethical finding that Professional Employer Organizations ("PEOs") may assume and manage human resource and personnel responsibilities as to law firms' lawyers:
    a. Ohio State Bar Association Committee on Legal Ethics and Professional Conduct ETH 2011-2 (2011);
    b. Professional Ethics Committee for the State Bar of Texas Opinion 560 (2005);
    c. North Carolina Formal Ethics Opinion 6 (2003);
    d. Connecticut Bar Association Committee on Professional Ethics Opinion 02-08 (2002); and
    e. District of Columbia Legal Ethics Committee Opinion 304 (2001).

///

///

///

OHAGAN MEYER ATTORNEYS + ADVISORS

4. Attached at Exhibit 2 is a true and accurate copy of a letter from Nevada Equal Rights Commission Compliance Investigator Michael J. Baltz to ManagedPay closing NERC Charge No. 0727-09-0369L for lack of jurisdiction.

I declare under penalty of perjury that the foregoing is true and correct.

/s/ Jeffrey Winchester
Jeffrey Winchester

Executed on June 16, 2025

O'HAGAN MEYER
ATTORNEYS & ADVISORS

# EXHIBIT

# 1.A

Open/close
Return to Browse Aa
Notes

# ETH 2011-2.

Ohio Ethics Opinions
2011.

ETH 2011-2.

December 2, 2011

*OSBA Informal Advisory Opinion 2011-02*

Re: Request for Informal Advisory Opinion

You have requested the opinion of the Ohio State Bar Association Committee on Legal Ethics and Professional Conduct on two questions: a) whether a law firm may contract with a professional employer organization ("PEO") that would assume and manage human resource and personnel responsibilities as to the firm's lawyers; and b) whether the law firm itself may own and operate a PEO as an ancillary business of the firm.

The Committee concludes that the Ohio Rules of Professional Conduct ("ORPC") do not prohibit either arrangement *per se*, providing that such arrangements do not interfere with the lawyers' professional responsibilities.

Background:

A PEO is a business entity that enters into an agreement with one or more employers for the purpose of co-employing all or part of the employer's workforce. *See* Ohio Rev. Code 4125.01(C),(fn1) APEO, acting as a "co-employer" with a law firm,(fn2) can potentially carry out many fimctions, including: handling the firm's payroll; being responsible for withholding and similar tax payments; dealing with employment laws (such as unemployment compensation); and administering employee benefits. The firm's lawyers are paid by or through the PEO. The firm remits payments to the PEO covering the firm's payroll, benefits and related costs, plus some increment above that amount as payment to the PEO for its services. *See generally* National Association of Professional Employer Organizations, *http://www.napeo.org/.*

Applicable Rules of Professional Conduct:

Your request for an opinion requires consideration of the following rules of the Ohio Rules of Professional Conduct ("ORPC"):

1,4 (a)( 1) (lawyer shall promptly inform client of any decision or circumstance that requires client's informed consent);

1,6 (lawyer shall not reveal information relating to representation of client);

1.7, 1.9 (conflicts of interest as to current clients and former clients);

2,1 (lawyer shall exercise independent professional judgment in representing client);

5.4 (lawyer shall not share legal fees with non-lawyer, form partnership with a non-lawyer where activities consist of practice of law or permit person who employs lawyer to direct or regulate professional judgment);

5.7 (responsibilities regarding law-related services).

Opinion:

"In recent years, an increasing number of businesses have engaged unrelated companies to perform one or more human resources functions. In some cases the employee management company acts as a co-employer .... The principal advantage of such contracting out is that the business does not have to handle the administrative functions. Additional benefits of a co-employment arrangement include the creation of larger employee groups for purposes of purchasing health and other benefits and the coverage of the employee management company by the workers' compensation laws." D.C. Bar Ass'n Ethics Op. 304 at 2-3 (Feb, 20, 2001).(fn3) Such co-employment arrangements can potentially be of benefit to law firms, especially smaller firms, which can possibly realize financial efficiencies by contracting with a PEO, potentially reducing overhead costs. However, these arrangements also raise ethics issues.

A. Professional Independence of the Lawyer

Rule 5.4 of the ORPC sets out several limitations applicable to any arrangement between a law firm and a PEO. First, Rule 5.4(c) provides that a lawyer may not permit a person who employs the lawyer "to direct or regulate the lawyer's professional judgment in rendering" legal services, Thus, notwithstanding any legal status of the PEO and law firm as "co-employers," the PEO cannot be allowed to interfere with the lawyers' advice and judgment on behalf of their clients, or be involved in directing or controlling the manner in which lawyers provide legal services. The law firm itself must retain direction and control over all activities of the lawyers that are co-employed with the PEO, including supervisory authority and the discretion to hire, promote and fire lawyers.

Second, Rule 5.4(b) bars lawyers from forming business relationships(fn4) with non-lawyers if any of the activities of the business "consist of the practice of law." A primary purpose of Rule 5.4 is to prevent lawyers fi-om aiding non-lawyers in the unauthorized practice of law. This rule would be violated if the PEO were involved in any aspect of the practice of law, such as holding the lawyers out to clients, directing or controlling the lawyers in the firm or acting in any lawyer-supervisory role. In addition. Rule 5.4(b) would be violated if the PEO undertook to advise its customers on employment law. The role of a

conventional PEO in providing employee management services to a law firm is not likely to encroach on the exclusive prerogative of lawyers to engage in the practice of law. However, lawyers must be aware of the PEO's activities on an ongoing basis, in order to ensure that the lawyers avoid association with a PEO whose activities constitute the practice of law.

Third, Rule 5.4(a) bars lawyers from sharing legal fees with non-lawyers, except in circumstances not relevant here. This rule would be violated, for instance, if the compensation of the PEO for its management services were calculated based on legal fees earned by the firm or its lawyers. To avoid implicating the rule against fee-splitting, the PEO's fee for services must not be a direct function of client fees paid to the firm for specific legal matters, and cannot be contingent on client payments. The payment of administrative-type fees to outside organizations has been approved under the former Ohio Code of Professional Responsibility; the fact that the PEO will presumably make a profit from providing its management services to the law firm does not implicate the rule against sharing fees with non-lawyers. In Opinion 90-23, 1990 WL 640499, *1 (Dec. 14, 1990), the Board of Commissioners on Grievances and Discipline found that the payment of fees for the services of a lawyer placement agency does not constitute an impermissible sharing of legal fees with non-lawyers. *See also* 111. St. Bar Ass'n Adv. Op. 90-23, 1991 WL 735075, *3 (Mar. 9, 1991) (payment of reasonable charges to "employee leasing company," similar to PEO, would not constitute impermissible fee-splitting; rather, payment "is proper as similar to fees paid to a payroll service company..."). *Accord,* D.C. Bar Ass'n Ethics Op. 304 at 6 (Feb. 20, 2001).

B. Confidentiality

Lawyers have a duty of confidentiality to clients under Rule 1.6 of the ORPC, subject to certain exceptions not relevant here. A law firm that contracts with a PEO as the co-employer of the firm's lawyers must ensure that no information relating to the representation of clients is disclosed improperly. The law firm can provide personnel and accounting information to the PEO as necessary. However, the law firm must retain sole control of client files and maintain the

confidentiality of all client information, including client billing data that could reveal information relating to the representation.

C. Conflicts of Interest

As noted above, a feature common to PEO's is that they act as co-employers of their customers' employees. In the law-firm context, this characteristic does not, alone, raise conflict issues under ORPC 1.7 (current-client conflicts), 1.9 (former-client conflicts) or 1.10 (imputation of conflicts). It is possible that multiple law firms may contract with the same PEO, including counsel for clients that are adverse to each other. However, each law firm would continue as the co-employer solely of its own lawyers, and there would be no sharing of lawyers between or among law firms contracting with a common PEO. In effect, each law firm and its lawyers would constitute its own "silo," thus avoiding any inherent conflict issues.(fn5) The fact that lawyers may make lateral employment moves between firms served by the same PEO would not alter the usual conflict rules applicable to such moves.

D. Client Disclosure

Rule 1.4(a)(1) requires the lawyer to inform the client of any circumstance that requires the client's informed consent. But the fact that a law firm outsources its employee management function to a PEO is not such a circumstance.

It is necessary to reasonably consult with the client and obtain client consent as to circumstances that are relevant to the lawyer's representation of the client. For instance, an offer of an aggregate settlement is a "circumstance" under Rule 1.4 that requires disclosure and informed consent. ABA Comm. on Legal Ethics and Prof'l Resp. 06-438 (Feb. 10, 2006). Likewise, the possibility of entering into a lawyer retainer agreement with an arbitration provision requires disclosure and client consent, ABA Comm. on Legal Ethics and Prof'l Resp. 02-425 (Feb. 20, 2002). And where a law firm contracts with outside lawyers or non-lawyers to handle a client's matter, disclosure and client consent can be required. Ohio Bd. of Comm'rs on Grievances and Disc. Op. 2009-6 (Aug. 14, 2009). These circumstances each have an impact on the client's representation

and legal rights. In contrast, the law firm's chosen method of managing its own payroll, benefits and tax payments is an administrative decision that does not reasonably have an impact on the client's representation. Accordingly, a law firm's agreement with a PEO does not invoke Rule 1.4(a)(1) or require client disclosure or consent.

E. Other Ethics Opinions Regarding PEO's

Legal ethics committees in several other jurisdictions have concluded that a law firm is ethically permitted to enter into an agreement with a PEO for the management of some or all of the firm's human resource functions, assuming adherence to the governing ethics rules. *See, e.g.,* Colo. Bar Ass'n Ethics Comm. Abs. 2007-9 at 1 (no date) ("Generally, it is ethical for law firms, or sole practitioners, to use a PEO for hiring attorneys, so long as the attorney and the law firm adhere to [Colorado ethics rules]."); Conn. Bar Ass'n Comm. on Prof'l Ethics Op. 02-08 (June 24, 2002) (no per se violation of ethics rules in contracting wdth PEO, providing no interference with lawyers' professional judgment and client confidences protected); D.C. Bar Ass'n. Ethics Op. 304 at 1 (Feb. 20, 2001) (law firm may contract with PEO "but only if the arrangement does not prevent or inhibit any lawyer from abiding by the applicable Rules of Professional Conduct."); N.H. Bar Ass'n Ethics Comm. Formal Op. 1989-90/9 at 1, 2 (July 25, 1990) (law firm may contract with company owned by non-lawyers to act as co-employer in providing payroll and accounting services; arrangement with such "employee leasing" organization(fn6) must include "ongoing compliance with all provisions of the Rules of Professional Conduct in the delivery of legal services,"); N.C. State Bar Ass'n Ethics Comm. Formal Ethics Op. 6 at 1 (July 25, 2003) (law firm may contract with PEO to perform non-operational employment functions, including acting as co-employer, provided PEO does not control or influence exercise of independent professional judgment); Tex. S. Ct. Prof'l Ethics Comm. Op. 560, 2005 WL 2755022, *4 (Aug. 2005) (law firm may enter into arrangement as co-employer with "employee leasing" organization for provision of employee compensation and benefit services provided firm maintains exclusive control over hiring and termination, organization has no access to client information or right to manage duties of

employees and law firm employees not shared between customers of leasing organization).

F. Operating a PEO as a "Law-Related Service"

Lawyers and law firms may provide non-legal services by operating ancillary businesses, sometimes referred to as "law-related services." Rule 5.7(e) of the *ORPC* defines "law-related services" as those that "might reasonably be performed in conjunction with the provision of legal services and that are not prohibited as unauthorized practice of law when provided by a nonlawyer." Comment [4] to Rule 5.7 notes that such ancillary services "may be provided through an entity that is distinct from that through which the lawyer provides legal services. If the lawyer individually or with others has control of such an entity's operations or owns an interest in the entity," the rule requires reasonable measures to inform customers of the entity that they are not receiving legal services, and that the protections of the attorney-client relationship do not apply. *Id.*

Law firms may operate many different kinds of ancillary businesses. "A broad range of economic and other interests of clients may be served by the lawyers' engaging in the delivery of law related services. Examples of law-related services include providing title insurance, financial planning, accounting, trust services, real estate counseling, legislative lobbying, economic analysis,... and patent, medical or environmental consulting." ORPC 5.7, cmt. [9].

In 1994, the Board of Commissioners on Grievances and Discipline considered whether attorneys within a law firm could own and operate as an ancillary business a company that would provide workers' compensation claims administration services to employers. Op. 94-7, 1994 WL 876388 (June 17, 1994). In approving the arrangement, the Board cited its previous opinion in which it tacitiy approved an attorney's operation of a business providing litigation support services to other attorneys. *Id* at *3 (citing Op. 88-18, 1988 WL 508809 (Aug. 12, 1988)). The Board also cited its previous Opinion 90-23, 1990 WL 640499 (Dec. 14, 1990), in which it held that two Ohio attorneys could

operate a business providing temporary lawyers to law firms, provided that the placement agency avoided violating several disciplinary rules under the former Code of Professional Responsibility ("Code"). *Id.* The Board's approval there was predicated on the owners' plan to keep their legal practice separate from the corporation operating the placement service. 1990 WL 640499 at * 1.

The ownership and operation of a PEO as an ancillary business of a law firm is similar to the workers' compensation claims administration business that the Board approved in Opinion 94-7, the lawyer-placement agency approved in Opinion 90-23 and the litigation support service business approved in Opinion 88-18. These opinions were issued under the former Code. However, in promulgating and recommending the Ohio Rules of Professional Conduct to the Ohio Supreme Court prior to their adoption effective February 1, 2007, the Supreme Court Task Force on Rules of Professional Conduct noted that current Rule 5.7 "is consistent with Advisory Opinion No. 94-7" regarding ancillary businesses.

On all these bases, we conclude that a law firm's ownership and operation of a PEO as an ancillary business is permissible, provided that the firm complies with Rule 5.7. This mandate includes Rule 5.7(b) (a law firm that operates a PEO as an ancillary business may not make its provision of PEO services contingent on the PEO's customers also agreeing to legal representation) and Rule 5,7(c) (the law firm may not make its provision of legal services to clients contingent on the clients agreeing to become customers of the law-firm-operated PEO.

Conclusion:

Provided that applicable Rules of Professional Conduct are adhered to, a law firm may contract with a professional employer organization that would assume and manage the firm's human resource functions. Equally, a law firm may own and operate a professional employer organization as an ancillary business.

Sincerely,

Legal Ethics and Professional Conduct Committee

OHIO STATE BAR ASSOCIATION

Note: Advisory Opinions of the Ohio State Bar Association Legal Ethics and Professional Conduct Committee are informal, non-binding opinions in response to prospective or hypothetical questions regarding the application of the Supreme Court Rules for the Government of the Judiciary, the Rules of Professional Conduct, the Code of Judicial Conduct, and the Attorney's Oath of Office.

---------------------

Footnotes:

1. In Ohio, as in many other jurisdictions, PEO's are autlnorized by statute.*See* Rev. Code 4125.01 - 4125,99, *See also* Ohio Admin. Code 4123-17-15. This opinion solely considers PEO's under Ohio's attorney ethics rules, without considering whether any arrangement that complies with the ORPC also complies with any applicable state or federal statute, rule or other requirement.

2. For convenience, this opinion will speak in terms of a "law firm" as the entity that contracts with the PEO. However, the principles considered here and the conclusions reached also apply to solo attorneys who might seek to enter into such agreements.

3. Available at http://www.dcbar.org/forjawyers/ethcis/legal_ethics/opinions/opinion304.cfm.

4. While Rule 5.4(a) proscribes a "partnership" between lawyers and non-lawyers, it is clear that the prohibition extends to all forms of business relationships. *See* Ohio State Bar Ass'n Informal Op. 82-2 at 3 (Aug. 3, 1982) (prohibition against lawyer-nonlawyer "partnerships" under DR 3-103(A) of former Ohio Code of Professional Responsibility applies to any "association, partnership or other organization."); Bd. of Comm'rs on Grievances and Disc. Op.

97-1, 1997 WL 85762 (Feb. 14, 1997) (franchise agreement between lawyers and non-lawyers violates DR 3-103(A)).

5. The fact that different firms contracting with the same PEO would not share lawyers distinguishes PEO's from lawyer-placement agencies. Temporary or contract lawyers working through the same placement agency may work for several different law firms, including on matters in which the firms represent clients adverse to each other. That situation can raise conflict issues.*See* ABA Comm. on Ethics and Prof 1 Resp. Formal Op. 88-356 at 1-4 (Dec, 16, 1988) (discussing conflict and disqualification issues arising from firm's employment of temporary lawyers). *Compare* D.C. Bar Ass'n Ethics Op. 304 at 5 (Feb, 20, 2001) (discussing PEO's and concluding that "because there will be no sharing of employees between law firms... we see no ... conflict of interest problems.").

6. Some ethics opinions label the arrangement as an "employee leasing" agreement. However, in the cited ethics opinions using that term, the described characteristics of such an-angements are the same as for a PEO.

My Folder
SEARCH

- Print
- Email
- Folder
- Download

- 

"" style="border: 0px; vertical-align: bottom;">

"" style="border: 0px; vertical-align: bottom; visibility: hidden; display: none;">

- CASEMAKER © 2015 Lawriter, LLC. All Rights Reserved.
  - Privacy
  - Settings
  - Contact Us
- 1-877-659-0801

## NOTE



0/255

- CANCEL
- SAVE

## DOWNLOAD

# EXHIBIT

# 1.B



MEMBERSHIP CONTACT US SITEMAP

ABOUT THE CENTER COURSES & EVENTS REFERENCES RESOURCES BOOKSTORE MEMBERS ONLY

THE TEXAS CENTER FOR LEGAL ETHICS AND PROFESSIONALISM

REFERENCES

PROCEDURAL & CONDUCT RULES

TEXAS PROFESSIONAL ETHICS OPINIONS

Texas Professional Ethics Opinions

Type in a specific opinion number or search for specific keywords.

Go To Opinion Keyword Search

OPINION 560

THE PROFESSIONAL ETHICS COMMITTEE FOR THE STATE BAR OF TEXAS

August 2005

## QUESTION PRESENTED

May a law firm lease its lawyer and nonlawyer personnel from an unaffiliated employee leasing company that leases lawyers and nonlawyer personnel to other law firms?

## STATEMENT OF FACTS

A law firm proposes to enter into a contractual relationship with an unaffiliated employee leasing company under which the law firm and the leasing company are coemployers of the law firm's employees. The contract provides that the law firm's employees will be considered the leasing company's employees for the payment of wages and payroll taxes. The law firm will reimburse the employee leasing company for all payroll expenses and will pay a negotiated service fee. The leasing company will provide the same service for other law firms, whose clients may hold adverse interests. None of the client law firms will, through the leasing company, interact with each other, share client information, or share office space.

The client law firm will retain control over the selection, hiring, and termination of its employees. The employees will act under the client law firm's exclusive supervision and will be compensated based on salaries and terms set by the client law firm. In the case of each client law firm that is a client of the employee leasing company, neither the staff of the employee leasing company nor any employees employed by other law firms under similar arrangements with the leasing company will participate in the client law firm's provision of legal services. The employee leasing company will not have access to the law firm's privileged communications or confidential information, including the identity of its clients. The employee leasing company will provide limited employer and personnel management services to employees who have been hired by the client law firm; the employee leasing company will not recruit, place, train, or supervise the law firm's employees.

## DISCUSSION

The relationship proposed here appears to be a traditional employee leasing relationship. The leasing company will provide limited payroll functions and provide benefits to client law firms' employees while refraining from any management or control of the law firm or its employees. The issue is whether such an arrangement creates either actual or potential conflicts in violation of Rule 1.06(b) of the Texas Disciplinary Rules of Professional Conduct. Rule 1.06(b) provides in relevant part that:

> ". . . a lawyer shall not represent a person if the representation of that person:
> (1) involves a substantially related matter in which that person's interests are materially and directly adverse to the interests of another client of the lawyer or the lawyer's firm; or
> (2) reasonably appears to be or become adversely limited by the lawyer's or law firm's responsibilities to another client or to a third person . . . ."

Because the employee leasing company is a single entity that "employs" individuals from multiple law firms that serve clients with varying interests, the possibility of actual or potential conflicts of interest must be considered. The nature of the relationship between the law firm and the employee leasing company is, therefore, extremely important.

This Committee previously addressed this issue in Professional Ethics Committee Opinion 508 (October 1994), which determined that:

> ". . . it would be improper for a lawyer who is employed by a leasing company to perform work for a client whose interest is adverse to that of the client of another lawyer who is employed by the same leasing company, even though those lawyers are "leased" to separate law firms." At the time that Opinion 508 was issued in 1994, employee leasing in Texas was governed by article 9104 of the Texas Revised Civil Statutes, which had been enacted in 1993. Section 1 of article 9104 provided in relevant part:
>
> > ". . . . (8) "Licensee" means a person licensed under this Act to provide staff leasing services.
> > . . . . (11) "Staff leasing services" means an arrangement by which employees of a

licensee are assigned to work at a client company . . . . . . . ."

The importance of the nature of the employer-employee relationship between leased attorney and employee leasing company for the result reached in Opinion 508 was made clear in Professional Ethics Committee Opinion 515 (July 1996), which held that an attorney may contract with a placement agency that assigns attorneys to various law firms for short-term projects. The Committee noted that the leased attorneys in Opinion 508 were the legal employees of the employee leasing company, whereas the contract lawyers considered in Opinion 515 were employees of the law firms to which they were assigned and were not employees of the placement agency because the agency did not have the power to direct the attorneys' work.

In 1995, article 9104 of the Texas Revised Civil Statutes was reenacted as chapter 91 of the Texas Labor Code. New section 91.004 was added to deal specifically with the special circumstances of staff leasing in the case of employees, such as attorneys, who are subject to licensing requirements. Section 91.004 as originally enacted provided as follows:

"Sec. 91.004. Effect of Other Law on Clients and Employees.
(a) This chapter does not exempt a client of a license holder, or any assigned employee, from any other license requirements imposed under local, state, or federal law.
(b) An employee who is licensed, registered, or certified under law and who is assigned to a client company is considered to be an employee of the client company for the purpose of that license, registration, or certification."

The legal status of lawyers and other licensed professionals who are employed under staff leasing arrangements was further clarified by the enactment in 1997 of section 91.004(c) of the Labor Code, which provides as follows:
"(c) A license holder is not engaged in the unauthorized practice of an occupation, trade, or profession that is licensed, certified, or otherwise regulated by a governmental entity solely by entering into a staff leasing agreement with a client company and assigned employees."

Finally, in 1999, the coemployment relationship between staff leasing companies and their clients was clarified by amendment of section 91.032 of the Labor Code to read as follows:

"Sec. 91.032. Contract Requirements.
(a) A contract between a license holder and a client company must provide that the license holder:
(1) shares, as provided by Subsection (b), with the client company the right of direction and control over employees assigned to a client's worksites;
(2) assumes responsibility for the payment of wages to the assigned employees without regard to payments by the client to the license holder;
(3) assumes responsibility for the payment of payroll taxes and collection of taxes from payroll on assigned employees;
(4) shares, as provided by Subsection (b), with the client company the right to hire, fire, discipline, and reassign the assigned employees; and
(5) shares, as provided by Subsection (b), with the client company the right of direction and control over the adoption of employment and safety policies and the management of workers' compensation claims, claim filings, and related procedures.
(b) Notwithstanding any other provision of this chapter, a client company retains responsibility for:
(1) the direction and control of assigned employees as necessary to conduct the client company's business, discharge any applicable fiduciary duty, or comply with any licensure, regulatory, or statutory requirement;
(2) goods and services produced by the client company; and
(3) the acts, errors, and omissions of assigned employees committed within the scope of the client company's business."

Section 91.032(b)(1) of the Labor Code provides that the client company retains direction and control of assigned employees for the purposes of conducting the client company's business, discharging any applicable fiduciary duty, and complying with professional licensing requirements. Additionally, section 91.004(c) provides that a staff leasing company will not, by entering into a staff leasing agreement with a client company that involves licensed employees, be engaged in the unauthorized practice of a licensed occupation, trade or profession. The Labor Code thus explicitly contemplates the existence of a dual employer relationship, such as the one contemplated here. In the contractual arrangement described here, the law firm will retain its employer status over its licensed attorneys and support staff and will retain responsibility for ensuring that its employees comply with professional licensing requirements, such as the requirement to avoid conflicts, and fiduciary requirements including the requirement to protect confidential information as required by Rule 1.05 of the Texas Disciplinary Rules of Professional Conduct. Neither the leasing company described here nor any of its other law firm clients will have actual knowledge of a particular law firm's clients because the leasing company will have no access to law firms' client information. Furthermore, any presumption of imputed knowledge is unwarranted in this situation because each client law firm retains its individual identity and employer status, as well as the exclusive ability to control its employees; any imputed knowledge is therefore contained within the individual law firm.

The law firm, pursuant to section 91.032(b)(3) of the Labor Code, will remain liable for the malpractice of its employees. The law firm will retain all the rights and responsibilities of a traditional employer except for the limited personnel management functions explicitly provided for in the proposed contract. The law firm will specify the salaries to be paid, and the leasing company's fee will be contractually determined and unrelated to any fees charged by the law firm for services performed. In such circumstances, there is no violation of Rule 1.04(f)'sprohibition against the division of legal fees. The leasing company and the law firm are completely separate entities, and the leasing company will have no access to confidential client information. The leasing company is merely providing an administrative service, the provision of which requires that the law firm's employees also be considered the "employees" of the leasing company. Comment 1 to Rule 1.06 notes that "[l]oyalty is an essential element in the lawyer's relationship to a client." That loyalty is not threatened by the contractual relationship considered here.

## CONCLUSION

Under the Texas Disciplinary Rules of Professional Conduct, a law firm may contract with an employee leasing company for the provision of limited employee compensation and benefit services for the law firm's employees so long as the law firm maintains exclusive control over the hiring and termination of its employees, there is no sharing of employees among the various clients of the employee leasing company, the leasing company has no managerial or supervisory rights over the law firm's employees, and the leasing company has no access to client information.

# EXHIBIT

# 1.C

**2003 Formal Ethics Opinion 6**
**Contracting with Professional Employer Organization to Handle Human Resources, Payroll and Other Functions for Law Firm.**
**July 25, 2003**

*Opinion rules that a law firm may contract with a professional employer organization (PEO) to perform human resources, payroll and other non-operational employment functions, including the employment of the lawyers of the firm, provided the PEO does not control or influence the lawyers' exercise of independent professional judgment.*

**Inquiry:**
A professional employer organization (PEO), as described in N.C. Gen. Stat. §58-89-5(6) and (8), provides a small business with an alternative to the traditional employment relationship between a company and its workers. An employer that enters into a service agreement with a PEO agrees that human resource, payroll and other non-operational employment functions will be "outsourced" to the PEO. The PEO becomes the employing unit of the client company's workers. The service agreement typically obligates the PEO to pay the employees, pay and withhold payroll taxes, maintain workers' compensation coverage, provide employee benefit programs, establish protocols for consistent administration of human resource complaints, and provide worksite safety guidance. However, the worksite employees continue to be employees of the client company for all operational purposes. The client company continues to supervise and direct its core business operations and the employees who are operating the company. The PEO does not assume responsibility for the client company's business, does not direct or supervise the work, and does not participate in the profit and losses of the client company. The PEO's compensation is calculated as a percentage of payroll cost. The compensation is not related to the client company's operational income or the outcome of a client company's business transactions.

Formal Ethics Opinion 2001-2 ruled that there is no prohibition on a law firm entering into a contract with a management company to employ the nonlawyers in the firm, in the same manner as a PEO, provided the lawyers in the law firm can continue to fulfill their ethical duties, including the duty to exercise independent professional judgment, the duty to protect client property, and the duty to maintain client confidences. The opinion did not consider whether such an arrangement would be permissible if the employment of the firm's lawyers, as well as its nonlawyers, is outsourced.

To maximize efficiency and the economic benefit to a law firm, the entire employment function, including the employment of lawyers and nonlawyers, should be outsourced to the PEO. The PEO would not supervise or interfere with the law practice of the lawyers. The lawyers would be employees of the PEO only for payroll, tax reporting, benefit plans, workers' compensation, and other human resource-related functions. The compensation paid to the lawyers in the firm would be determined by the agreement between the lawyers who own or manage the firm. Is this arrangement prohibited by the



Rules of Professional Conduct (2003)?

**Opinion:**
Rule 5.4(a) of the Revised Rules of Professional Conduct (2003) prohibits sharing legal fees with a nonlawyer and Rule 5.4(d) prohibits a lawyer from practicing in a professional corporation or association if a nonlawyer has the right to direct or control the professional judgment of a lawyer. As noted in comment [2], Rule 5.4 expresses the "traditional limitations on permitting a third party to direct or regulate the lawyer's professional judgment in rendering legal services to another."

There is no specific prohibition in the Rules on the arrangement described in this inquiry. Provided the PEO does not control, seek to influence, or interfere with the lawyers' exercise of professional judgment and the compensation paid to the PEO is a percentage of the payroll costs and not a percentage of the legal fees earned by the firm, the employment outsourcing arrangement described in this inquiry does not violate Rule 5.4. Moreover, if the law firm retains complete control of the legal practice, there should be no problems with conflicts of interest, protecting client property that is entrusted to the firm, or with maintaining client confidentiality. *See, e.g.*, 2001 FEO 2.

# EXHIBIT A

# 1.D



DC BAR
Home Login Find a Member Site Map
Search
For Lawyers

Home > For Lawyers > Ethics > Legal Ethics > Opinions

For Lawyers
For the Public
Inside the Bar

# Opinion 304

donate
to
PRO
BONO

**Management of a Law Firm's Human Resources Functions by an Employee Management Company**

A law firm may contract out its human resources functions (even to the extent that the firm's employees are considered, for certain purposes, employees of an unrelated company), but only if the arrangement does not prevent or inhibit any lawyer from abiding by the applicable Rules of Professional Conduct and does not attempt to insulate any lawyer from liability for her own malpractice.

**Applicable Rules**

- Rule 1.8(g)(1) (Conflict of Interest; Malpractice Liability)
- Rule 5.1 (Responsibilities of a Partner or Supervisory Lawyer)
- Rule 5.3 (Responsibilities Regarding Nonlawyer Assistants)
- Rule 5.4 (Professional Independence of a Lawyer)
- Rule 5.5(b) (Unauthorized Practice of Law)

**Inquiry**

The Legal Ethics Committee has been asked whether the Rules of Professional Conduct permit a law firm to have all its workers—lawyers as well as non-lawyers—employed by an unrelated employment management company. The inquirer's firm includes two lawyers, one of whom is the owner of the firm. Both would become employed by the employee management company along with the approximately sixteen nonlawyer employees. The employee management company would be responsible for payroll services, employee benefits, withholding and similar tax payments, compliance with employment laws (e.g., Fair Labor Standards Act, immigration, Family and Medical Leave Act, Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA)), personnel recordkeeping, unemployment compensation, workers' compensation, and the like.

The inquirer advises that regardless of whether the law firm's workers are considered employees of the law firm, of the employee management company, or of both for purposes of the laws governing labor and employment, the law firm (in the person of its single owner) would retain, full management and supervisory authority (e.g., hiring, firing, promotion, setting of compensation, assignment and supervision of work). Moreover, the law firm would have custody and control of all client files, firm accounting information (other than employment-related information) information, and the like.

Put differently, the management company would not be an owner of the firm in lay terms, would not share in the profits of the law firm, would have no authority to make employment decisions, and would have no say in directing lawyers or legal assistants what duties to perform or how to carry out those duties. The management company would perform functions unrelated to the provision of legal services in much the same way that a cleaning service, messenger service, or photocopying company may assist a law firm.



The employee management company might provide similar services to other companies, including other law firms. Although the employee management company might in some cases be considered the employer or co-employer of the employees of all these firms from the standpoint of human resources law, these individuals would work at their separate law firms just as if they were employees of those firms. Indeed, the individual law firms will not necessarily even know the identities of the other firms doing business with the employee management company, and there would be no contact between the firms by virtue of their use of the same employee management company.

**Discussion**

In recent years, an increasing number of businesses have engaged unrelated companies to perform one or more human resources functions. In some cases the employee management company acts as a co-employer (as opposed to merely performing human resources functions). The principal advantage of such contracting out is that the business does not have to handle the administrative functions. Additional benefits of a co-employment arrangement include the creation of larger employee groups for purposes of purchasing health and other benefits and the coverage of the employee management company by the workers' compensation laws.

The relationship between a business—in this instance, a law firm—and an employee management company can take many forms. Two of these are the "professional employer organization," or PEO, and the administrative service organization, or ASO. A PEO is "a company which contractually assumes and manages . . . human resource and personnel responsibilities . . . for . . . small to mid-sized businesses." National Ass'n of Professional Employer Organizations, Common Questions About PEOs Answered, at 1 (downloaded from http://www.napeo.org /ind-questions.htm, Aug. 28, 2000). In some forms, a PEO can assume the role of the employer or co-employer of the work force of its client business (in this case, the law firm). Seventeen states currently require registration or licensing of PEOs, *id.*, though the District of Columbia is not one of them. A typical PEO client is a small business with about sixteen employees. *Id.* at 2. For the reasons discussed below, at least some PEOs appear to have policies and practices that are impermissible under the Rules of Professional Conduct.

Another form of employee management arrangement, called the ASO, administers a "client's" (in this case, the law firm's) human resource functions, payroll, employee benefits, workers' compensation, and government compliance, but does not "rely upon or assume an employment relationship with the employees, leaving the [law firm] as the sole employer." Rufus E. Wolff, "Client Service Agreements for ASO Clients," PEO Insider, Oct. 2000, at 6. The ASO provides its services as an administrative agent and advisor rather than as a co-employer, and hence ordinarily exercises no legal authority over the employees themselves. *Id.* at 6-7. Thus wages and employment taxes are paid under the Employer Identification Number of the client business, the client business remains the sponsor of employee benefit programs, and any workers' compensation claims are made under a policy issued to the client business. *Id.* at 6. Unlike a PEO, an ASO ordinarily is not liable for payment of employee wages or taxes. *Id.* at 7. Finally, an ASO is not subject to the state licensing requirements that apply to PEOs. *Id.*at 6.

A lawyer in this jurisdiction may practice alone, be a partner, associate or of-counsel in a private firm, work "in house" as a corporate or labor union counsel, toil in an accounting firm, labor in a public interest position, serve as a government lawyer, teach the law, or engage in any of a host

of other activities. Whatever the nature of a lawyer's employment, however, she must abide by the Rules of Professional Conduct. Put differently, the Rules forbid employment arrangements that may impair such responsibilities of a lawyer as the duties to exercise independent professional judgment on behalf of her client, D.C. R. Prof. Conduct 2.1; *see id.* 1.8(e)(2), to maintain the confidentiality of information gained during the course of a representation, *id.* 1.6, 1.8(e)(1), to act zealously on behalf of her client's interests, *id.* 1.3(a), to avoid situations in which her client's interests conflict with those of another client or of the lawyer herself, id. 1.7, and to supervise adequately the conduct of her organization's other lawyers, *id.* 5.1, and nonlawyers, *id.* 5.3.

Note that the supervisory responsibilities imposed by Rule 5.1 are not limited to employees of the supervising lawyer but extend to all lawyers over whom the lawyer has "direct supervisory authority." D.C. R. Prof. Conduct 5.1(b). In the case of nonlawyers, the responsibility covers those "employed *or retained by or associated with*" the lawyer, *id.* 5.3 (emphasis added), "whether employees or independent contractors," *id.* 5.3 comment [1]. "The key is supervision, and that supervision must occur regardless of whether the [nonlawyer] is employed by the attorney or retained by the attorney." *In re Opinion No. 24*, 128 N.J. 114, 127, 607 A.2d 962 (1992). Thus even if a lawyer or nonlawyer at the firm technically is the employee of the management company, the lawyers retain their full supervisory responsibilities under the Rules of Professional Conduct.[1]

The only practical difference between the proposed arrangement and the situation in a typical private law firm is that the mechanical aspects of employment will be handled by an entity other than the law firm. The employee management company will have no supervisory authority over any lawyer or nonlawyer in the firm, will play no role in employment decisions, will have no access to client confidences, and will occasion no conflicts by virtue of its presence. The supervisory lawyers in the firm will retain their responsibilities under Rules 5.1 and 5.3 to oversee the work of the other lawyers, and the nonlawyers, in the firm. *Cf. Florida Bar v. Flowers*, 672 So.2d 526 (Fla. 1996) (disciplining lawyer who allowed independent consultant to hold himself out as being employed by lawyer).

The involvement of the employee management company will not result in the sharing of any individual employees working on client matters—lawyers or nonlawyers—among firms that use the services of the employee management company. Because there will be no sharing of employees between law firms, and the various firms using the employee management company will not thereby have access to one another's files or offices, we see no client confidentiality or conflict of interest problems.[2]

We said in permitting the use of temporary lawyers that such individuals "and their employing lawyers each have an obligation to ensure that the appropriate standards and requirements are met." D.C. Ethics Op. 284 (1998). These include the ethical obligations of competence, independent professional judgment, undivided loyalty, and preservation of a client's confidences and secrets. *Id.* The same holds here: The management company may not exercise any control —formal or informal, direct or indirect—that would affect these or any other ethical obligations attendant upon the provision of legal services. This extends to decisions about the hiring, firing, promotion, compensation, and work assignments of lawyers and legal assistants (though such control may be permissible where only clerical or secretarial employees are involved and the control exercised is

unrelated to the provision of legal services). Moreover, the management company may not take over, wholly or partly, any of the lawyer's responsibilities outlined above.

The inquiry does not indicate the basis on which the management company will be compensated for its work. So long as the employee management company's compensation is not a function of the fees earned by the law firm, however, the arrangement will not implicate the fee-splitting prohibition of Rule 5.4. D.C. Ethics Op. 284 (1998) (payment of fee to agency providing temporary lawyers not fee splitting); ABA Formal Op. 88-356 (1988) (payment of fee to agency providing temporary lawyers not fee splitting, even where cost passed on to client); Ill. Op. 90-23 (1991); Mich. Informal Op. RI-310 (1998) (permitting fee based upon hours worked by leased lawyer but not upon fees collected for such work); Va. Legal Ethics Op. 1712 (1998); N.C. Op. RPC 104 (1991); N.J. Op. 631 (1989); *cf. Nat'l Treasury Employees Union v. U.S. Dep't of the Treasury*, 656 F.2d 848 (D.C. Cir. 1981) (prohibiting union that employed—and had supervisory control over—lawyers from receiving attorney fees above union's actual costs). Unlike the consulting firm whose "loans" of its lawyer-employees were disapproved in our Opinion 182 (1987), the employee management firm here will not—and may not— exercise supervisory authority over the lawyers or legal assistants. That the employee management firm presumably will realize a profit from its services to the law firm does not alter our position. *See* D.C. Ethics Op. 284 (1998) (permitting, by implication, agencies to profit from making lawyers employed by them available to law firms on a temporary basis); ABA Formal Op. 88-356 (1988) (expressly permitting same).

Moreover, we do not believe that the employee management agency would be engaged in the unauthorized practice of law because the agency would not be holding the lawyers out to clients (and indeed would not be dealing with clients at all), would have no control over the selection of lawyers to work for the firm, and would not supervise the practice of law by such lawyers. *See* D.C. Unauth. Prac. of Law Op. 6-99 (1999) (holding that activities of temporary lawyer placement agencies do not constitute unauthorized practice); ABA Formal Op. 88-356 n. 12 (1988) (furnishing temporary lawyers directly to clients would constitute unauthorized practice of law); Ill. Op. 90-23 (1991). As with the engagement of a temporary lawyer, the arrangement should be disclosed to clients if it is "material to the representation." *See* D.C. Ethics Op. 284 (1998) (establishing materiality threshold); ABA Formal Op. 88-356 (1988) (disclosure that lawyer is employed on temporary basis not required where she is working under direct supervision of regular firm lawyer). Because the hiring, firing, and conditions of employment are to be under the control of the lawyer-owner of the firm, we have little concern that the employee management arrangement will be used (and stress that it may not be used) to avoid the prohibition against invidious discrimination by lawyers in conditions of employment. *See* D.C. R. Prof. Conduct 9.1.

A lawyer may not limit prospectively her liability for her own malpractice, D.C. R. Prof. Conduct 1.8(g)(1); D.C. Ethics Op. 235 (1993), and a lawyer who did so using the device of an employee management company would violate Rule 1.8(g)(1). We note, though, that lawyers may in some instances avoid liability for the malpractice of their partners by practicing in a limited liability partnership or limited liability company, D.C. Ethics Op. 235 (1993); *see* D.C. Code §§ 29-1314 (1996) (professional limited liability corporations), 41-153.6(c) (1998) (limited liability partnerships). We normally do not address issues of law outside the Rules of Professional Conduct, D.C. Legal Ethics

Comm. R. C-4, and accordingly offer no view on whether the proposed arrangement would affect the malpractice liability of the lawyer-owner for errors and omissions of the other lawyers and nonlawyers working at the firm. "Whether a lawyer may be civilly or criminally liable for another lawyer's conduct is a question of law beyond the scope of [the Rules of Professional Conduct]." D.C. R. Prof. Conduct 5.1, comment [7]. We do observe, however, that from a professional responsibility standpoint, the supervisory responsibilities of an owner-lawyer, id. 5.1, 5.3, are personal to her, extend to everyone acting under her direction regardless of whether such individuals are her "employees," and would not be altered by the fact that the firm's employees were co-employed by another entity. Thus we do not see how the arrangement would—or could, consistently with the requirements of Rule 1.8(g)(1)—avoid liability for the owner's own errors and omissions, including whatever liability may result from inadequate supervision of others in the firm, and we offer no view on whether the arrangement would affect the liability of the owner under the *respondeat superior* doctrine.

We note that a number of other jurisdictions have approved similar arrangements, subject to the limitation that the lawyer-owner(s) of the firm, rather than the employee management agency, maintain exclusive control over hiring, firing, and other aspects of the lawyer's employment. *E.g.*, Ill. Op. 90-23 (1991); Mich. Informal Op. RI-310 (1998); Mo. Informal Op. 990019 (disapproving employee management where lawyer would not have unilateral right to discipline or terminate leased nonlawyer employee); N.C. Op. RPC 104 (1991); N.J. Op. 631 (1989).

Finally, some PEOs adhere to published standards of a trade organization known as the Employer Services Assurance Corporation ("ESAC"). ESAC requires that a PEO share with the "client" (i.e., the law firm), and in some instances exercise exclusively, the power to hire and fire employees (who here would include lawyers and legal assistants as well as clerical and secretarial staff), that the PEO have at least a shared right to direct and control the work of the employees, and that ESAC have access to client (i.e., law firm) work sites and records. A lawyer owner who permitted the removal of these rights and responsibilities wholly or partly from the management of the law firm would violate the Rules of Professional Conduct. Hence the use of a PEO by law firms in this jurisdiction is prohibited if the arrangement gives the PEO actual (as opposed to merely legal) authority over the hiring or firing of lawyers or legal assistants, or authorizes the PEO to direct or control the provision of legal services by any employee of the law firm. The responsibilities in question include the duties to exercise independent judgment on behalf of clients, *see* D.C. R. Prof. Conduct 2.1, 1.8(e)(2), maintain client confidences and secrets, *see id.* 1.6, 1.8(e)(1), act zealously on behalf of the client's interests, *see id.* 1.3(a), avoid conflicts, *see id.* 1.7, and supervise the conduct of the others working for the firm, *see id.* 5.1, 5.3. By contrast, the ASO form, or the PEO form without such objectionable attributes, does not appear to raise any of these concerns.

Thus we answer the inquiry in the affirmative, subject to the limitations and concerns noted above. Use of an employee management company by a law firm is permissible only if it does not affect the firm's provision of legal services and does not limit or infringe any of the duties and responsibilities of lawyers set out in the D.C. Rules of Professional Conduct.

Inquiry No. 99-6-21
Adopted: February 20, 2001

1. This is consistent with our prior ruling permitting the employment of temporary lawyers—a ruling that made no distinction based on whether the temporary lawyer is an employee of the employment agency or the law firm. *See* D.C. Bar Ethics Op. 284 (1998).

2. In particular, the special concerns about disqualification that may arise in respect of a temporary lawyer who works for more than one firm at a time, *see* ABA Formal Op. 88-356 (1988); D.C. Bar Ethics Op. 284 (1998), do not obtain here. Of course the normal conflicts requirements for lateral lawyers, *see* D.C. Ethics Op. 279 (1988), and nonlawyers, *see id.* § 4; D.C. Ethics Op. 227 (1992), will apply even where an individual moves between two law firms that use the same employee management company.





The District of Columbia Bar | 1250 H Street NW, sixth floor | Washington DC 20005-5937 | 202-737-4700 | **Directions/Parking**
©2009 D.C. Bar **Restrictions on Use** All rights reserved. **Privacy Policy** | **Accessibility Policy** | **Disclaimer** | **Author guidelines**

# EXHIBIT A

# 1.E

Connecticut Ethics Opinion
2002.
Informal 02-08.

June 24, 2002

INFORMAL OPINION 02-08

Use of Professional Employer Organizations

Your firm has contracted with a Professional Employer Organization (PEO) (a.k.a. employee leasing company) to manage the human resources aspects of your firm. As described by you and in literature from the national Association of Professional Employer Organizations, the PEO is a "co-employer" with the firm. The employees are considered employees of the PEO, which handles payroll and administers health, pension and related employee benefits. All aspects of the employee's work, including legal work, are controlled and directed by the law firm. The firm pays the PEO some increment above the cost of payroll and benefits. The PEO you contract with has several other law firms as clients.

You ask generally whether the firm's use of a PEO is in any way prohibited by the Rules of Professional Conduct and then pose two specific questions.

Ethics committees in other jurisdictions have considered the question of the ethical propriety of the use of PEOs by law firms and have found no inherent ethical violations. Most of these opinions either explicitly assume, or place an affirmative duty on the firm to insure that, the PEO will not interfere with the independent professional judgment of the "employees" and will have no access to information about the firm's clients. ABA Formal Opinion 88-356; North Carolina Ethics Opinion RPC 104, 1991; State Bar of Michigan, Opinion RI-310, 1998; South Carolina Advisory Opinion 91-09; Illinois Advisory Opinion 90-23. A number of opinions have also addressed the question of whether these arrangements constitute fee splitting, in violation of Rule 5.4(a), and have concluded that they do not. ABA Formal Opinion 88-356; North Carolina Ethics Opinion RPC 104, 1991; South Carolina Advisory Opinion 91-09; Illinois Advisory Opinion 90-23; New Jersey Ethics Opinion 631, 1989.

We concur with these opinions that there is no per se violation of the rules in having a PEO "lease" employees, including lawyers, to a law firm so long as it is clear that the PEO will not interfere with the professional judgment of the lawyers involved and the firm and the individual lawyers will take steps to protect client confidences.

As to your specific questions:

1. Is there any type of conflict of interest or loss of attorney-client privilege if two associates from different law firms (both considered employees of the same PEO) represent opposing clients

As noted above, a fundamental ethical prerequisite to the arrangement between a law firm and a PEO is that the PEO will have no control over the professional judgment of the lawyers it "employs." Therefore, any loyalty owed by employee/attorneys to the PEO is subservient to duties owed to clients. The fact that some "employees" of a PEO have a tangential relationship through the PEO does not, in and of itself, suggest that a conflict exists. As long as the employee/lawyers adhere to their ethical obligations to their clients (particularly Rules 1.6, 1.7, 1.8, and 1.9) and as long as the firm is free to and actually does exercise its supervisory responsibilities inherent in Rule 5.1, no conflict should arise. Ethics opinions in other jurisdictions have reached a similar conclusion on this particular question. South Carolina Bar Ethics Advisory Committee 91-09; Illinois State Bar Association Advisory Opinion No. 90-23.

2. Might the use of a PEO by a law firm be considered a partnership in-fact and, therefore, a violation of Rule 5.4(b)

Rule 5.4(b) prohibits lawyers from forming partnerships with non-lawyers if any of the activities of the partnership consist of the practice of law. Based on the descriptions you have provided, the arrangements between your firm and

the PEO do not have any indicia of a partnership. Therefore, the arrangement does not violate Rule 5.4(b).

You should note that this committee offers no opinion on the legal aspects of the relationship between the PEO, the firm and the lawyer/employees.

CASEMAKER © 2015 Lawriter, LLC. All Rights Reserved.    Privacy    Settings    Contact Us    1-877-659-0801

Connecticut Ethics Opinion
2002.
Informal 02-08.

June 24, 2002

INFORMAL OPINION 02-08

Use of Professional Employer Organizations

Your firm has contracted with a Professional Employer Organization (PEO) (a.k.a. employee leasing company) to manage the human resources aspects of your firm. As described by you and in literature from the national Association of Professional Employer Organizations, the PEO is a "co-employer" with the firm. The employees are considered employees of the PEO, which handles payroll and administers health, pension and related employee benefits. All aspects of the employee's work, including legal work, are controlled and directed by the law firm. The firm pays the PEO some increment above the cost of payroll and benefits. The PEO you contract with has several other law firms as clients.

You ask generally whether the firm's use of a PEO is in any way prohibited by the Rules of Professional Conduct and then pose two specific questions.

Ethics committees in other jurisdictions have considered the question of the ethical propriety of the use of PEOs by law firms and have found no inherent ethical violations. Most of these opinions either explicitly assume, or place an affirmative duty on the firm to insure that, the PEO will not interfere with the independent professional judgment of the "employees" and will have no access to information about the firm's clients. ABA Formal Opinion 88-356; North Carolina Ethics Opinion RPC 104, 1991; State Bar of Michigan, Opinion RI-310, 1998; South Carolina Advisory Opinion 91-09; Illinois Advisory Opinion 90-23. A number of opinions have also addressed the question of whether these arrangements constitute fee splitting, in violation of Rule 5.4(a), and have concluded that they do not. ABA Formal Opinion 88-356; North Carolina Ethics Opinion RPC 104, 1991; South Carolina Advisory Opinion 91-09; Illinois Advisory Opinion 90-23; New Jersey Ethics Opinion 631, 1989.

We concur with these opinions that there is no per se violation of the rules in having a PEO "lease" employees, including lawyers, to a law firm so long as it is clear that the PEO will not interfere with the professional judgment of the lawyers involved and the firm and the individual lawyers will take steps to protect client confidences.

As to your specific questions:

1. Is there any type of conflict of interest or loss of attorney-client privilege if two associates from different law firms (both considered employees of the same PEO) represent opposing clients

As noted above, a fundamental ethical prerequisite to the arrangement between a law firm and a PEO is that the PEO will have no control over the professional judgment of the lawyers it "employs." Therefore, any loyalty owed by employee/attorneys to the PEO is subservient to duties owed to clients. The fact that some "employees" of a PEO have a tangential relationship through the PEO does not, in and of itself, suggest that a conflict exists. As long as the employee/lawyers adhere to their ethical obligations to their clients (particularly Rules 1.6, 1.7, 1.8, and 1.9) and as long as the firm is free to and actually does exercise its supervisory responsibilities inherent in Rule 5.1, no conflict should arise. Ethics opinions in other jurisdictions have reached a similar conclusion on this particular question. South Carolina Bar Ethics Advisory Committee 91-09; Illinois State Bar Association Advisory Opinion No. 90-23.

2. Might the use of a PEO by a law firm be considered a partnership in-fact and, therefore, a violation of Rule 5.4(b)

Rule 5.4(b) prohibits lawyers from forming partnerships with non-lawyers if any of the activities of the partnership consist of the practice of law. Based on the descriptions you have provided, the arrangements between your firm and

the PEO do not have any indicia of a partnership. Therefore, the arrangement does not violate Rule 5.4(b).

You should note that this committee offers no opinion on the legal aspects of the relationship between the PEO, the firm and the lawyer/employees.

CASEMAKER © 2015 Lawriter, LLC. All Rights Reserved.    Privacy    Settings    Contact Us    1-877-659-0801

# EXHIBIT 2

NEVADA EQUAL RIGHTS COMMISSION

DETR
Nevada Department of Employment, Training and Rehabilitation

JIM GIBBONS
Governor

LARRY J. MOSLEY
Director

MAUREEN COLE
Administrator

March 3, 2010

Michael R. Miller, Esq.
KUNKEL MILLER & HAMENT
15438 N. Florida Avenue
Tampa, FL 33613

RE: Charles Edgerly vs Managed Pay
NERC No. 0727-09-0369L EEOC No. 34B-2009-01477

Dear Mr. Miller:

The Nevada Equal Rights Commission reviewed the above referenced complaint and has ruled that this case be closed because the Commission lacks jurisdiction due to no employee/employer relationship.

Should you have any questions, please do not hesitate to contact the Commission at (702) 486-7161.

Sincerely,

Michael J. Baltz
Michael J. Baltz
Compliance Investigator II

MJB/ra

cc: Managed Pay
Nereida Hrade, Human Resources Manager

Grant Sawyer Building • 555 E. Washington Avenue, Suite 4000 • Las Vegas, Nevada 89101
Phone: 702.486.7161 • Fax: 702.486.7054
www.nvdetr.org

(NSPO Rev. 3-09) (O) 603

EEOC Form 161 (11/09)

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

# DISMISSAL AND NOTICE OF RIGHTS

To: **Charles Edgerly**
**9505 Teton Vista Ave.**
**Las Vegas, NV 89108**

From: **Los Angeles District Office**
**255 E. Temple St. 4th**
**Los Angeles, CA 90012**

☐ *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **34B-2009-01477** | **Karrie L. Maeda, State & Local Coordinator** | **(213) 894-1100** |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☐ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[X] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[X] Other *(briefly state)* **No Jurisdiction**

## - NOTICE OF SUIT RIGHTS -

*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

[signature]

**Olophius E. Perry,**
**District Director**

May 12, 2010
*(Date Mailed)*

Enclosures(s)

cc:

**Nereida Hrabe**
**H/R Manager**
**MANAGED PAY**
**6410 S. Eastern Ave., Suite 100**
**Las Vegas, NV 89119**

**J.P. Kemp**
**7435 W. Azure Drive, Suite 110**
**Las Vegas, NV 89130**